IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| FREDDIE H. SIMMONS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:18-cv-00121 |
| | ) | |
| SCOTTY McKAY, et al., | ) | JUDGE CAMPBELL |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Freddie H. Simmons, Jr., an inmate at the Lois DeBerry Special Needs Facility in Nashville, Tennessee, filed this *pro se* civil rights complaint under 42 U.S.C. § 1983. (Doc. No. 1.) Plaintiff also filed an application to proceed *in forma pauperis*. (Doc. No. 10.) For the following reasons, Plaintiff's application to proceed *in forma pauperis* will be granted, but this action will be dismissed because Plaintiff fails to state a claim upon which relief may be granted.

**I.  Application to Proceed as a Pauper**

The Court may authorize a prisoner to file a civil suit without prepaying the filing fee. 28 U.S.C. § 1915(a). Because it appears from Plaintiff's *in forma pauperis* application (Doc. No. 10) and revised *in forma pauperis* application (Doc. No. 16) that he lacks sufficient financial resources from which to pay the full filing fee in advance, Plaintiff's application (Doc. No. 10) will be granted. Plaintiff nonetheless remains responsible for paying the full $350.00 filing fee, so the fee will be assessed as directed in the accompanying Order. 28 U.S.C. § 1915(b)(1).

**II.  Initial Review**

The Court is required to conduct an initial review and dismiss the complaint if it is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief

against a defendant who is immune from such relief. 28 U.S.C. §§ 1915A, 1915(e)(2)(B); 42 U.S.C. § 1997e(c)(1). The Court must construe a *pro se* plaintiff's complaint liberally, *United States v. Smotherman*, 838 F.3d 736 (6th Cir. 2016) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)), and accept the plaintiff's factual allegations as true unless they are entirely without credibility. *See Thomas v. Eby*, 481 F.3d 434, 437 (6th Cir. 2007) (citing *Denton v. Hernandez*, 504 U.S. 25, 33 (1992)).

### A. Factual Allegations

Plaintiff's statement of facts in this case includes allegations in numerous pages attached to the complaint (Doc. No. 1), and allegations in eleven additional notices or letters (Doc. Nos. 3–5, 7–9, 13, 15, 17–19). Plaintiff's handwriting is generally legible, but he does not provide a coherent narrative of the events that give rise to his claims. To understand the facts presented by Plaintiff, the Court must consider the allegations in all of Plaintiff's filings together and draw a number of inferences. Accepting any specific factual allegations in the filings as true, and drawing the necessary reasonable inferences in Plaintiff's favor, the Court has established the following summary of events for the purpose of initial review.

#### 1. Events Up to and Including Plaintiff's First Period of Incarceration

Plaintiff alleges that "Franklin [County]"—including the Winchester Police Department ("WPD") and the Huntland Police Department—has targeted him because he is an African-American since 1989. (Doc. No. 8 at 2.) Plaintiff also alleges that individual WPD officers have targeted him at various times. For example, at some point, WPD Deputy Duram created a false police report reflecting that Plaintiff "kicked the dog's teeth in" and "kicked the door in on the house off Glaus Rd. in Belvidere." (Doc. No. 1 at 6.) WPD Officer Scotty McKay was "jealous of [Plaintiff because he has] a lot of white female friends," and would follow Plaintiff into the

2

convenience store, stand behind Plaintiff, and stare at the items Plaintiff was purchasing. (Doc. No. 13 at 1–2.)

The individual who accounts for most of Plaintiff's allegations against the WPD, however, is Officer Danny Mantooth. According to Plaintiff, Mantooth is a "targeting uneducated racist" (Doc. No. 4 at 2) who "use[d] to date [the mother of his child]" (Doc. No. 5 at 1) and is "responsible for . . . many people . . . lost in the system." (Doc. No. 7 at 1.) Mantooth and fellow WPD officer Brian Mitchel frequently followed Plaintiff to the "Black neighborhood" and asked him personal identifying questions. (Doc. No. 1 at 4, 6.) Mitchel and Mantooth were "always trying to control and terrorize the [Black] neighborhood." (*Id.* at 6; Doc. No. 4 at 2.) Plaintiff alleges that Mantooth "stole [his] money on three occasions," including once when Mantooth and two other WPD officers came "storming in" a duplex where Plaintiff was located and stole $1,500 from him. (Doc. No. 1 at 9.) The second instance occurred in July 2009, when Mantooth "found something on the ground and pinned it on" Plaintiff (Doc. No. 4 at 2), resulting in Plaintiff "[doing] 6 [years] for nothing" and paying $987. (Doc. No. 1 at 9; Doc. No. 4 at 2). On the third occasion, Mitchel, Mantooth, and another WPD officer "sprayed [Plaintiff with] pepper [mace] twice," "transported [him] to a secluded place like the old [county] jail," and stole $750. (Doc. No. 1 at 9.)

As stated above, Mantooth allegedly "found something on the ground and pinned it on" Plaintiff in July 2009. (Doc. No. 4 at 2.) This led to Plaintiff's conviction on a "Schedule II charge" in the General Sessions Court in Franklin County, Tennessee. (Doc. No. 1 at 5, 8.) Plaintiff alleges that he "didn't have anything," but the court "took Danny Mantooth's word." (Doc. No. 8 at 1.) General Sessions Judge Farris imposed a sentence of incarceration, during which he "had Plaintiff going to" Moccasin Bend Mental Health Institute four times, and to Centerstone, a behavioral health services provider, three times. (Doc. No. 1 at 5, 8; Doc. No. 8 at 1; Doc. No.

3

18 at 1.) Plaintiff alleges that he should have served a sentence of "11 [months and] 29 days," but that he actually served about four years. (Doc. No. 1 at 5, 8; Doc. No. 8 at 1.) Plaintiff was released in early 2014. (Doc. No. 1 at 5, 8; Doc. No. 8 at 1.) According to Plaintiff, Judge Farris "use[d] to date [the mother of his child]," who is "a white attractive female blonde." (Doc. No. 5 at 1–2.) Plaintiff alleges that Judge Farris "and his co-workers hate to . . . see a blonde with a Black man, especially the one Judge Farris fell in love with." (*Id.* at 2.) This makes it more difficult for Plaintiff to be "released anywhere." (*Id.*)

After Plaintiff's release, Robert Baggett "kept trying to suspend" Plaintiff's driver's license because he told Plaintiff that he owed $3,175 to the state of Tennessee. (Doc. No. 1 at 4–5.) The Court takes judicial notice of the fact that Robert Baggett is the Franklin County Circuit Court Clerk.[1]

### 2. Events Leading to Plaintiff's Second Period of Incarceration

Plaintiff also alleges that he has experienced inappropriate conduct by members of Tennessee Highway Patrol ("THP"). Plaintiff had three alleged interactions with THP officers in 2014. First, Trooper Orr conducted a search of Plaintiff and his vehicle, and told Plaintiff that he would go to jail if Plaintiff did not sign a ticket for running a stop sign. (*Id.* at 10.) Plaintiff maintains that he was not guilty of this offense. (*Id.*) Second, Trooper Ula "touched [Plaintiff's] private parts." (*Id.*) And third, Trooper Fraley conducted a stop of Plaintiff's vehicle as he was leaving a car wash, pulled on Plaintiff's pockets, and said "Why are [you] avoiding me and where are the pills at[?]" (*Id.*)

---

[1] "Under Rule of Evidence 201, the court can take judicial notice of 'a fact that is not subject to reasonable dispute,' either because the fact 'is generally known within the trial court's territorial jurisdiction,' or it 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Cary v. Cordish Co.*, No. 17-5103, 2018 WL 1734696, at *4 (6th Cir. Apr. 10, 2018). The website for the Tennessee Administrative Office of the Courts reflects that Robert Baggett is the Clerk for the Franklin County Circuit Court. *Clerks*, TENNESSEE STATE COURTS, https://www.tncourts.gov/courts/court-clerks/clerks-list (last visited Apr. 16, 2018).

In a seemingly unrelated matter, Plaintiff alleges that on October 22, 2015, he was in a car accident in Winchester, Tennessee. (*Id.* at 3; Doc. No. 9 at 1.) There is an unsettled insurance claim related to this accident. (Doc. No. 1 at 3; Doc. No. 9 at 1.)

On March 10, 2016, Plaintiff alleges, a "tall blonde" THP officer stopped Plaintiff in Jasper, Tennessee (Doc. No. 1 at 10), while he was "walking to [his] grandmother's [residence]." (*Id.* at 8; Doc. No. 8 at 2; Doc. No. 18 at 1.) This unnamed trooper told Plaintiff he would "cut [Plaintiff loose]" if a driver's license check reflected that Plaintiff did not have any pending warrants. (Doc. No. 1 at 10.) After THP Trooper Stephens arrived at the scene, however, the other trooper "changed his whole story." (*Id.*) WPD Officer Casey Boiling, who was also on the scene, called for backup and "8 to 10" officers soon arrived. (Doc. No. 8 at 2.) Boiling "claims [that Plaintiff] had bench warrants pending" at the time. (Doc. No. 1 at 8; Doc. No. 8 at 1; Doc. No. 18 at 1.) WPD Officer Chuck Stines arrested Plaintiff. (Doc. No. 8 at 1.)

Plaintiff alleges that Judge Gram, a Circuit Court Judge serving the 12th Judicial District of Tennessee, set Plaintiff's bond at $5,000 "for nothing." (Doc. No. 1 at 5, 8; Doc. No. 8 at 1.) According to Plaintiff, he has a "Schedule II" charge in Circuit Court, but charges for "revoked license, evading, resisting, [and] assault" were dropped. (Doc. No. 1 at 3, 5, 8.)

### 3. Conditions of Plaintiff's Current Confinement

Plaintiff repeatedly alleges that he is incarcerated as a result of "false charges" (Doc. No. 1 at 3; Doc. No. 3 at 1) and that he "went to jail for nothing." (Doc. No. 1 at 10; Doc. No. 13 at 1; Doc. No. 17 at 1.) According to Plaintiff, the "Rachel Jackson Building" has informed him that he is serving an eight year sentence imposed by the Circuit Court, but Plaintiff maintains that he "didn't get" this sentence. (Doc. No. 1 at 5; Doc. No. 4 at 1.)

On October 3, 2016, Plaintiff was transported to DeBerry Special Needs Facility ("DSNF") on safekeeping status, and he has been "on lockdown . . . ever since." (Doc. No. 1 at 7–9; Doc. No. 4 at 1–2; Doc. No. 8 at 1–2.) That same day, five DSNF staff members were involved in an incident that caused Plaintiff significant injuries. Specifically, Corporal Haughty sprayed "orange [mace]"—"the strongest [mace]"—on Plaintiff's arms, back, and neck, and Plaintiff sustained third degree burns. (Doc. No. 1 at 13; Doc. No. 4 at 1; Doc. No. 5 at 1.) Haughty repeatedly told Plaintiff to "pull [his] clothes off." (Doc. No. 1 at 13.) Sergeant Wooten shot Plaintiff with "the playball gun," causing "bad bruises" on Plaintiff's calves. (Doc. No. 1 at 13; Doc. No. 4 at 1; Doc. No. 5 at 1.) Corporal Briggs recorded the incident on a phone camera. (Doc. No. 1 at 13.) Officer Lovett observed the incident. (*Id.*) Plaintiff also alleges that some of the clothes and personal items he was wearing that day are unaccounted for, including paperwork and $300 that was in the pockets of his shorts. (Doc. No. 5 at 1.) Corporal Miller was "suppose[d] to send" these items "back to Franklin [County]." (*Id.*)

While he has been incarcerated, Plaintiff alleges that six medical providers—Dr. O'Toole, Dr. Garrett, Therapist Sinners, Dr. Litsy, Dr. Jefferies, and Dr. Aries—have been "pushing the issue of thinking [he] need[s] a conservator to make [his] medical decisions." (Doc. No. 1 at 7.) Plaintiff also alleges that another DSNF inmate in the building where he resides "needs proper emergency special treatment" for a severe leg injury. (Doc. No. 9 at 1.)

Accordingly to Plaintiff, DSNF staff members have "cheat[ed him] out of" money by charging him for commissary items that he did not receive. (Doc. No. 5 at 2.) DSNF staff also improperly withheld his television and radio, Warden Holloway "took batteries and coffee off [the] commissary sheet," and inmates in his unit are not allowed to order as many items from the commissary sheet as inmates in other units. (Doc. No. 7 at 3; Doc. No. 9 at 2–3.)

6

Plaintiff requests various forms of equitable relief throughout his filings—to be reassigned from lockdown to general population at DSNF (Doc. No. 1 at 7); that the Court "get [him] out of [DSNF] when [he] go[es] up for parole" (Doc. No. 7 at 3); and to be released from custody "by mid-summer of 2018" (Doc. No. 1 at 3; Doc. No. 13 at 1). Plaintiff also requests monetary damages. (Doc. No. 1 at 14; Doc. No. 18 at 2.)

### 4. State Proceedings for Appointment of a Conservator

Plaintiff also filed a document from a state court proceeding with his handwritten notes on it. (Doc. No. 15.) The document is an Answer to the State of Tennessee's Petition to appoint a conservator for Plaintiff, drafted by Plaintiff's Attorney ad Litem in that proceeding. (*Id.*) The certificate of service reflects that Plaintiff's Attorney ad Litem provided a copy of this Answer to Plaintiff, the Tennessee Department of Correction, Plaintiff's Guardian ad Litem, Plaintiff's brother, and Plaintiff's father on March 11, 2018. (*Id.* at 2.) Thus, it appears this proceeding was ongoing as of March 16, 2018, the post-marked date on the envelope in which Plaintiff mailed the document to the Court. (*Id.* at 3.) Among other things, Plaintiff's handwritten notes reflect that he does not need "protection or assistance," nor does he need "medical and psychiatric help." (*Id.* at 1.)

## B. Standard of Review

To determine whether a prisoner's complaint "fails to state a claim on which relief may be granted" under 28 U.S.C. §§ 1915A and 1915(e)(2)(B), the Court applies the same standard as under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010). The Court therefore accepts "all well-pleaded allegations in the complaint as true, [and] 'consider[s] the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief.'" *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)). An assumption of truth does not, however, extend to allegations that consist of legal conclusions or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). A *pro se* pleading must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

**C.     Discussion**

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).

**1.     Dismissal of Municipal Defendant**

Plaintiff names the Franklin County Sheriff's Department as a defendant. "[F]ederal district courts in Tennessee have frequently and uniformly held that police departments," such as the Franklin County Sheriff's Department, "are not proper parties to a § 1983 suit." *Mathes v. Metro. Gov't of Nashville and Davidson Cty.*, No. 3:10-cv-0496, 2010 WL 3341889, at *2 (M.D. Tenn. Aug. 25, 2010) (collecting cases). Thus, the Franklin County Sheriff's Department will be dismissed.

Elsewhere in his filings, however, Plaintiff unequivocally states his intent to name Franklin County itself as a defendant. (*See, e.g.*, Doc. No. 3 at 1 ("Go ahead and tell Franklin [County] that I am suing them . . . .").) For Franklin County to be liable under Section 1983, Plaintiff must show that the county's "municipal policy or custom directly caused" the alleged deprivation of his

constitutional rights. *Hadrick v. City of Detroit, Mich.*, 876 F.3d 238, 243 (6th Cir. 2017) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-92 (1978)). "A municipality 'may not be sued under § 1983 for an injury inflicted solely by its employees or agents.'" *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (quoting *Monell*, 436 U.S. at 694). Here, Plaintiff alleges that Franklin County has discriminated against him because of his race since 1989. This allegation of a nearly thirty-year policy of discrimination is not sufficient to state a claim for relief because it is "conclusory"—that is, Plaintiff has not alleged specific facts to support it. *See Iqbal*, 556 U.S. at 678. Accordingly, Franklin County will be dismissed.

### 2. Identification of Individual Defendants

Plaintiff names nine individuals as defendants on the complaint form (Doc. No. 1 at 2), but attached two pages to the complaint reflecting that he "want[s] to sue" approximately forty-two other people.[2] (*Id.* at 4, 7.)

Beyond naming them as defendants, Plaintiff does not mention many of these individuals again. Even under the liberal construction afforded to *pro se* plaintiffs, the Court "is not required to accept non-specific factual allegations and inferences or unwarranted legal conclusions," and a plaintiff "must allege that the defendants were personally involved in the alleged deprivation of federal rights." *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (citations omitted) (affirming dismissal of a *pro se* prisoner's complaint for failure to state a claim where the plaintiff "failed to allege with any degree of specificity which of the named defendants were personally involved in or responsible for each of the alleged violations of his federal rights"). Upon review of the complaint (Doc. No. 1) and Plaintiff's other filings (Doc. Nos. 3–5, 7–9, 13, 15, 17–19), the

---

[2] This number is approximate because some of the names are not complete, and at least one name is so similar to a name listed on the complaint form that the Court cannot determine whether Plaintiff is referring to two different people or the same person. (*Compare* Doc. No. 1 at 2 (listing Casey Boiling as a defendant on the complaint form), *with* Doc. No. 1 at 4 (listing Carmen Boiling as an additional person that Plaintiff "want[s] to sue").)

Court has identified specific factual allegations against only the following twenty-five defendants: Judge Farris, Judge Gram, Robert Baggett, Casey Boiling, Brian Mitchel, Danny Mantooth, Chuck Stines, Deputy Duram, Dr. O'Toole, Dr. Garrett, Therapist Sinners, Dr. Litsy, Dr. Jefferies, Dr. Aries, Trooper Orr, Trooper Ula, Trooper Fraley, Trooper Stephens, Corporal Haughty, Sergeant Wooten, Corporal Briggs, Corporal Lovett, Corporal Miller, Warden Holloway, and Scotty McKay.

And so, the Court will address Plaintiff's allegations against these twenty-five defendants, and all other listed individuals will be dismissed for failure to state a claim.

### 3. Dismissal of Individual Defendants

Of the twenty-five individual defendants, Plaintiff allegations against many of them simply fail to describe behavior that is unconstitutional. For instance, WPD Deputy Duram allegedly created a false police report about Plaintiff at some point in the past. Plaintiff does not, however, allege that he suffered any injury or consequences as a result of this police report. Thus, Plaintiff's allegations against Deputy Duram most closely resemble a claim for defamation, which is not a constitutional violation. *See Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005) (citing *Paul v. Davis*, 424 U.S. 693, 701–03 (1976) ("Absent a further injury, such as loss of a government job or loss of a legal right or status, defamation, by itself, does not constitute a remediable constitutional claim."); *see also Jarrett v. Twp. of Bensalem*, 312 F. App'x 505, 507 (3d Cir. Feb. 20, 2009) ("[T]he mere existence of an allegedly incorrect police report fails to implicate constitutional rights."). The Court will, therefore, dismiss Defendant Duram.

Likewise, the Court will dismiss WPD Officer McKay. Plaintiff alleges that Officer McKay followed Plaintiff into the convenience store and stared at Plaintiff while he purchased items because McKay was jealous of Plaintiff. This behavior, however, is simply not a

10

constitutional violation, as Plaintiff's allegations reflect that McKay did not restrain his liberty in any way by staring at him at the store. *See Slusher v. Carson*, 540 F.3d 449, 545 (6th Cir. 2008) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) ("The Supreme Court has made clear that '[a] seizure triggering the Fourth Amendment's protections occurs only when government actors have, by means of physical force or show of authority, in some way restrained the liberty of a citizen.'") (internal quotation marks omitted)).

Additionally, Plaintiff raises concerns about his own medical treatment and the medical treatment of other inmates at his current place of confinement, DeBerry Special Needs Facility. As an initial matter, Plaintiff does not have standing to bring medical treatment claims on behalf of other inmates. *See Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008) (quoting *Newson v. Norris*, 888 F.2d 371, 381 (6th Cir. 1989)) (noting that prisoners "lack[] standing to assert the constitutional rights of other prisoners"). As to his own medical treatment, Plaintiff is suing six medical providers—Dr. O'Toole, Dr. Garrett, Therapist Sinners, Dr. Litsy, Dr. Jefferies, and Dr. Aries—for advocating that Plaintiff needs a conservator to make his medical decisions.[3] This allegation does not state a claim for at least two reasons. First, Plaintiff does not allege that there has actually been any change in his medical care. That is, it may be the providers' medical opinion that Plaintiff needs a conservator, but Plaintiff does not allege that he has experienced constitutionally inadequate medical care as a result of this opinion. Second, "[a]s a general rule, a patient's disagreement with his physicians over the proper course of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017) (citing *Estelle*, 429 U.S. at 107). These six defendants will therefore be dismissed.

---

[3] As stated in Section II.A.4, Plaintiff's filings reflect that there was an ongoing state proceeding for the appointment of a conservator as of March 16, 2018.

Plaintiff's variety of complaints regarding the DSNF commissary also fail to state a claim. Plaintiff alleges that he is not allowed to purchase as many items as inmates in other units, that he has not received all of the items that he purchased, and that DSNF Warden Holloway removed batteries and coffee from the commissary list. As a general matter, prisoners "have no federal constitutional right to purchase items (food or non-food) from a commissary at all." *Adams v. Hardin Cty. Det. Ctr.*, No. 3:16-CV-P29-CRS, 2016 WL 2858911, at *3 (W.D. Ky. May 16, 2016) (collecting cases). While prison officials are not necessarily free to interfere with a prisoner's access to commissary items for any reason, Plaintiff's allegations in this action do not implicate a constitutional right. *See Wolfe v. Alexander*, No. 3:11-cv-0751, 2014 WL 4897733, at *8 (M.D. Tenn. Sept. 30, 2014) ("[D]enial of access to commissary in retaliation for . . . exercising a constitutionally protected right could, for example, be unconstitutional."). Accordingly, Defendant Holloway will be dismissed.

Plaintiff also fails to state a claim for DSNF staff members withholding his television and radio. Although the Due Process Clause of the Fourteenth Amendment protects against the unlawful taking of a person's property, the alleged "deprivation of a prisoner's property does not violate due process if adequate state remedies are available to redress the wrong." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Hudson v. Palmer*, 468 U.S. 517, 533–36 (1984)). The Sixth Circuit Court of Appeals has held that "the state of Tennessee does provide an adequate post-deprivation remedy for takings of property." *McMillan v. Fielding*, 136 F. App'x 818, 820 (6th Cir. 2005) (citing *Brooks v. Dutton*, 751 F.2d 197, 199 (6th Cir. 1985)). Plaintiff does not allege that he attempted to avail himself of this post-deprivation remedy, or that it was inadequate. Accordingly, Plaintiff's claim for withholding his radio and television will be dismissed.

#### 4. Judicial and Quasi-Judicial Immunity

Plaintiff also alleges impropriety by two state court judges and a state clerk of court, all of whom are entitled to immunity from this civil suit. Plaintiff complains that Franklin County General Sessions Judge Farris[4] forced him to receive mental health treatment seven times during his first period of incarceration, and that 12th Judicial District Circuit Court Judge Gram set Plaintiff's bond at $5,000 "for nothing" after Plaintiff's March 2016 arrest. "It is well-established that judges enjoy judicial immunity from suits arising out of the performance of their judicial functions." *Brookings v. Clunk*, 389 F.3d 614, 617 (6th Cir. 2004) (citing *Pierson v. Ray*, 386 U.S. 547, 553–54 (1967)). Judicial immunity cannot be "overcome by allegations of bad faith or malice." *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (citing *Pierson*, 386 U.S. at 554). There are only two situations in which judicial immunity does not apply—"if the judge's activities were 'non-judicial' in nature or if the judge's actions are performed without any jurisdiction to do so." *Brookings*, 389 F.3d at 617 (citing *Mireles*, 502 U.S. at 11). Neither of these exceptions applies to the alleged actions of Judge Farris and Judge Gram in Plaintiff's state criminal cases. Accordingly, both judges will be dismissed under the doctrine of absolute judicial immunity.

Robert Baggett, the Franklin County Circuit Court Clerk, is entitled to immunity as well. Plaintiff alleges that Robert Baggett "kept trying to suspend" Plaintiff's driver's license because Plaintiff owed $3,175 to the state of Tennessee. "The United States Supreme Court has recognized the need for government officials to be able to make impartial decisions without the threat of personal liability for actions taken pursuant to their official duties." *Bush v. Rauch*, 38 F.3d 842,

---

[4] Plaintiff also alleges that Judge Farris had a personal grudge against him based on his race, making it more difficult for Plaintiff to be "released anywhere." To the extent that Plaintiff is attempting to allege that Judge Farris caused Plaintiff's first period of incarceration to last longer than it should have, a Section 1983 action is not the proper vehicle to challenge to the "fact or duration" of a period of confinement. *See Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973)); *infra* Section II.C.5.

847 n.5 (6th Cir. 1994) (collecting cases). Thus, "absolute judicial immunity has been extended to non-judicial officers who perform 'quasi-judicial' duties"—which includes duties "integral or intertwined with the judicial process." *Id.* at 847 (citations omitted). The Court determines whether a government official is entitled to absolute quasi-judicial immunity "using a 'functional' approach, under which [it] look[s] to the nature of the function being performed rather than the identity of the actor performing it." *In re McKenzie*, 716 F.3d 404, 412 (6th Cir. 2013) (citing *Bush*, 38 F.3d at 847). Here, Baggett's alleged actions were done in the course of his duties as a clerk on behalf of the court. Thus, Baggett will be dismissed. *See Lyle v. Jackson*, 49 F. App'x 492, 494 (6th Cir. 2002) (applying quasi-judicial immunity to state clerks of court who allegedly failed to provide requested copies of previous filings and transcripts).

### 5. Challenges to Plaintiff's Convictions

Plaintiff alleges that, in July 2009, WPD Officer Danny Mantooth "found something on the ground and pinned it on" him, resulting in a conviction on a "Schedule II charge" and a four-year period of incarceration. As an initial matter, the Court cannot determine the specific nature of this conviction, as "Schedule II" refers to a category of controlled substances rather than an actual offense. *See* Tenn. Code Ann. § 39-17-408(a) ("Schedule II consists of the drugs and other substances, by whatever official name, common or usual name, chemical name, or brand name designated, listed in this section."). To the extent that Plaintiff is attempting to assert Section 1983 claims against Mantooth for planting evidence that resulted in a conviction based on possession of a Schedule II controlled substance, however, any such claims would be barred.

A plaintiff can only bring Section 1983 claims "that, if successful, 'would necessarily imply the invalidity' of a prior conviction or sentence," *Cummings v. City of Akron*, 418 F.3d 676, 682 (6th Cir. 2005) (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)), if that same conviction

14

or sentence has already been "reversed, expunged, or invalidated." *S.E. v. Grant Cty. Bd. of Educ.*, 544 F.3d 633, 637 (6th Cir. 2008); *see also Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005) ("[A] state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration."). A successful Section 1983 claim against Mantooth based on planting evidence in July 2009 would necessarily imply the invalidity of any subsequent convictions requiring Plaintiff's possession of that same evidence. Plaintiff's filings reflect that his prior conviction has not been invalidated in any way. Accordingly, the Court cannot consider any Section 1983 claims against Mantooth based on allegedly planting evidence in July 2009.

The Court also cannot consider Plaintiff's broad, vague challenges to his current confinement. Plaintiff essentially alleges that he is not guilty of the "Schedule II" charge for which he was presumably convicted in the 12th Judicial District Circuit Court in 2016, and disputes the length of his current sentence. Plaintiff expressly requests to be released from confinement. The Supreme Court has repeatedly held that "a prisoner in state custody cannot use a § 1983 action to challenge 'the fact or duration of his confinement.'" *Wilkinson*, 544 U.S. at 78 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973)). "Where the relief sought is 'a determination that [a state prisoner] is entitled to immediate release or a speedier release from that imprisonment' the prisoner must pursue relief through a writ of habeas corpus, not through § 1983." *Wershe v. Combs*, 763 F.3d 500, 504 (6th Cir. 2014) (quoting *Preiser*, 411 U.S. at 500). Thus, the Court is barred from considering Plaintiff's challenges to the "fact or duration" of his current confinement in this action.

### 6. Statute of Limitations

Plaintiff's remaining claims are barred by the applicable statute of limitations. In Tennessee, there is a one year statute of limitations for the filing of Section 1983 claims. *See Johnson v. Memphis Light Has & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting Tenn. Code Ann. § 28-3-104(a)(3)) ("Under Tennessee law, 'civil actions for compensatory or punitive damages, or both, brought under the federal civil rights statutes' must commence 'within one (1) year after the cause of action accrued.'"). Under federal law, the "standard rule" is that "the statute of limitations period begins to run when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred." *Harrison v. Michigan*, 722 F.3d 768, 772–73 (6th Cir. 2013) (quoting *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996)). A prisoner's civil complaint is deemed filed when it is submitted to prison officials for mailing. *Richard v. Ray*, 290 F.3d 810, 813 (6th Cir. 2002). The Court infers that Plaintiff submitted the complaint for mailing on the same day that he signed it, and therefore considers the date of filing to be February 1, 2018. (Doc. No. 1 at 14.) Thus, the Court will consider Plaintiff's claims to be untimely if they are based on injuries that he knew or had reason to know occurred prior to February 1, 2017.

The time-barred claims are based on alleged incidents that occurred during three different periods—first, at various times prior to Plaintiff's current period of confinement; second, on March 10, 2016, when Plaintiff's current period of confinement commenced; and third, on October 3, 2016, the day that Plaintiff was transferred to DeBerry Special Needs Facility. This first category of incidents includes a broad range of allegations: that, at some unspecified time before his current period of incarceration, WPD Officers Mantooth and Mitchel harassed Plaintiff, stole his money, and sprayed him with mace; that, in 2014, THP Trooper Orr conducted an improper search of

16

Plaintiff's vehicle and threatened to take him to jail if Plaintiff did not sign a ticket for a traffic violation that he did not commit; that, in 2014, THP Trooper Fraley improperly searched and questioned Plaintiff as he was leaving a car wash; and that, in 2014, THP Trooper Orr inappropriately touched Plaintiff. Although Plaintiff does not specify exactly when these alleged incidents took place, it is clear that they occurred well before February 1, 2017. Accordingly, Plaintiff's claims arising from these alleged incidents are untimely, and these five defendants will be dismissed.

To the extent that Plaintiff asserts claims arising from his detention and arrest on March 10, 2016, such claims are also untimely. Plaintiff alleges that THP Trooper Stephens somehow influenced his arrest, that WPD Officer Casey Boiling called for backup, that Boiling incorrectly maintained that Plaintiff had pending bench warrants, and that WPD Officer Chuck Stines arrested him. "[A] claim for wrongful arrest under § 1983 accrues at the time of the arrest . . . ." *Fox v. DeSoto*, 489 F.3d 227, 233 (6th Cir. 2007) (citing *Wallace v. Kato*, 549 U.S. 384, 388–90 (2007)). Plaintiff filed this action nearly two years after the date of his arrest. Thus, Plaintiff's claims for false arrest or false imprisonment are time barred, and these three defendants will be dismissed.

Finally, the statute of limitations also bars Plaintiff's claims arising from the alleged incident with DSNF staff members on October 3, 2016. Specifically, Plaintiff alleges that Corporal Haughty sprayed him with strong mace, Segreant Wooten shot Plaintiff with "the playball gun," Corporal Briggs recorded the incident on a phone, Officer Lovett observed, and Corporal Miller was responsible for the loss of the personal property that was in Plaintiff's pockets at the time of the incident. Because these alleged actions occurred approximately sixteen months before Plaintiff filed this action, Plaintiff's claims against these five defendants will be dismissed as untimely.

**III. Conclusion**

For these reasons, Plaintiff's application to proceed *in forma pauperis* (Doc. No. 10) will be granted, and this action will be dismissed because Plaintiff fails to state a claim upon which relief may be granted. 28 U.S.C. §§ 1915A, 1915(e)(2)(B); 42 U.S.C. § 1997e(c)(1). Pursuant to 28 U.S.C. § 1915(a)(3), the Court will certify that any appeal in this matter would not be taken in good faith. The Court, therefore, will not grant Plaintiff leave to proceed *in forma pauperis* on any appeal.

The Court will enter an appropriate Order.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE